UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLYDE JORDAN,

        Petitioner,

v.                                   CASE NO. 11-14358

LLOYD RAPELJE,

        Respondent.
_____/

**OPINION AND ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT, DENYING PETITIONER'S MOTION TO STRIKE AND CROSS-MOTION FOR SUMMARY JUDGMENT, DISMISSING PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

Michigan prisoner Clyde Jordan ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that he is being held in violation of his constitutional rights. Petitioner was convicted in the Wayne County Circuit Court of first-degree murder, assault with intent to commit murder, and two counts of felony possession of a firearm. He was sentenced in 1993 to life imprisonment without the possibility of parole on the murder conviction, a concurrent term of twenty-to-thirty years' imprisonment on the assault conviction, and consecutive terms of two years' imprisonment on the felony firearm convictions (to be served concurrently to each other).

Respondent moves for summary judgment, seeking to dismiss the petition as untimely, and Petitioner moves to strike and submits a cross-motion for summary judgment. For the reasons set forth, the court grants Respondent's motion, denies

Petitioner's motions, and dismisses the petition for failure to comply with the one-year limitation set forth in 28 U.S.C. § 2244(d). The court also denies a certificate of appealability and denies leave to proceed *in forma pauperis* on appeal.

## I. FACTS AND PROCEDURAL HISTORY

Petitioner's convictions arise from the shooting death of Tyrone Wilder and the non-fatal shooting of Samuel Braddock in Detroit, Michigan, on April 8, 1993. The court adopts the summary of the relevant trial testimony set forth by defense counsel on direct appeal, to the extent it is consistent with the record. Those facts are as follows:

> The prosecution's testimony showed that the instant shooting occurred shortly before midnight on Thursday, April 8, 1993, near the side entrance of Clyde Jordan's apartment building at 12290 Goulburn in Detroit. Tyrone Wilder was found lying in the street adjacent to the building. The pathologist testified that Tyrone Wilder had been shot three times in the right side of his back and died of the multiple gunshot wounds. TIII 94, 98, 104. Sam Braddock was taken to the hospital from a gas station where he had driven Wilder's car; Braddock was suffering from multiple gunshot wounds. In the property belonging to Wilder and Braddock the police found over $800 in currency and a pager. T III 75-80, 94.
>
> Shortly after Tyrone Wilder was found lying in the street and Braddock was found in the car at the gas station, the police found Clyde Jordan down the block from the shooting scene, lying on the front lawn at 12249 Goulburn. He had been shot several times, but was able to tell them that a girl had been shot in the nearby apartment building. There was blood on the porch and on a broken window at the front of the house. T II 66-68; T III 110-114,119; T IV 123-126.
>
> On the sidewalk at the shooting scene at 12290 Goulburn, the police found a loaded rifle, exhibit 30. T II 42, 55-57, 62; T III 121-122. In that area they also found many fired casings and the casings were three different calibers: nine millimeter, 7.62 millimeter, and .45 caliber automatic. T II 46-55. At a service station about a mile away, the police found a nine millimeter pistol, exhibit 35, in the shot-up black 1988 Mercury sedan that Sam Braddock had driven there. T II 58; T III 66-77.
>
> A firearms expert testified that the rifle, exhibit 30, fired the six 7.62 caliber casings found at the shooting scene. T IV 45. Sam Braddock's pistol,

exhibit 35, fired the eight nine millimeter casings recovered there. T IV 50. Pieces of bullets removed from the car had been fired from the rifle, but one fired bullet found in the car had been fired from the pistol. T IV 51-53. Three casings found in the car had been fired from Braddock's pistol. T IV 53-54. Two metal fragments recovered from Tyrone Wilder's body, exhibit 33, were from bullet jackets but otherwise could not be identified. T IV 50-51. A nine millimeter bullet, exhibit 34, had been recovered from Defendant Clyde Jordan but could not be positively identified as being fired from Braddock's pistol. T IV 56.

Sheila Davis testified that she was Clyde Jordan's cousin and had been Tyrone Wilder's girlfriend. T II 81, 84. Sam Braddock carried a Glock pistol and had been staying with Sheila Davis and Tyrone Wilder since Braddock's brother had been killed on the night of April 6-7. T II 86, 122-124. She identified exhibit 35, the pistol found in her shot-up car, as similar to the gun Braddock carried. T II 128. At about 11:20 p.m. on April 8, Clyde Jordan, Tyrone Wilder, and Sam Braddock left Sheila Davis's house in Davis's car, the 1988 Mercury subsequently found at the gas station. T II 80-83, 121.

Adrenna Glenn testified that she was seventeen years old and was the girlfriend of Clyde Jordan, who was the father of the younger of her two children, the children being one and one-half years and six months old. In April of 1993 Glenn and Jordan lived together in an apartment at 12290 Goulburn. T II 129-131. On the evening of April 8, Tinsley Walls came to the apartment and fell asleep on the couch after drinking some beer. T II 138-139. Clyde Jordan had gone out, but returned at about 11:00 p.m. with two other men. T II 139-141; T III 14. Mr. Jordan went into the bedroom with Adrenna Glenn and said something about a large sum of money and killing someone and about Glenn cleaning up blood, although she was not sure what was said. He took his rifle out of the closet and left. T II 142-154, 178-180; T III 23. A short time later Adrenna Glenn heard gunshots outside her window, but had no way of knowing who fired first. T II 155-157; T III 56-57.

Adrenna Glenn went on to state that when she looked out the window she saw one man lying down and one sitting next to him, but did not see Clyde Jordan. She went outside, but when she got close to the sitting man, he waved his pistol at her and told her not to come near him, but also told her to "call an ambulance, that his boy was dead." T II 159-160, 165-168. After she got back inside and unsuccessfully tried to wake Tinsley Walls, she looked out the window again; she saw a car drive up and an arm come out the car window as if the person were going to shoot. The man sitting on the ground got up and ran away. T II 169-172.

3

On cross-examination Adrenna Glenn stated that the police took her to the station after the shooting and took her statement. The police kept her at the station without her children from about two in the morning until the next afternoon. T III 32. The police told her, "if I didn't tell the truth they would take my kids away from me and put me in jail." T III 19, 34-35, 56. She claimed that she told the police the truth during that first interrogation, but admitted that she would say anything necessary in order to keep her kids. T III 19, 27, 35. She also claimed that at the time of her trial testimony she was no longer worried about losing her children. T III 48. No one except the police had threatened her. T III 61-62.

Ms. Glenn subsequently wrote Clyde Jordan a letter in which she admitted that she could not remember anything that happened before the shootings; she had been half asleep, and both the radio and television were playing. TIII 24-25. She was not sure if Jordan had said anything about killing somebody. T III 23. She testified that she had not lied in her letter to Defendant Jordan. TIII 49-50. She admitted that she was reluctant to be a witness against Jordan. Till 50-51, 59-60.

Sam Braddock testified that at Tyrone "Tae-Tae" Wilder's house on April 8 he met Clyde Jordan for the first time. TIII 125-127; T IV 11. Defendant Jordan told Braddock and Wilder "that he had some freaky white girls at the motel." TIII 129. They drove around in Wilder's girlfriend's car to look for the girls, but could not find them. Mr. Braddock admitted that he had a pistol with him, exhibit 35, even though he was on probation for a prior conviction, but claimed he had the pistol because his brother had been killed the day before. T III 131-132; T IV 12-14. They drove to Clyde Jordan's apartment and went inside. Defendant Jordan went into the bedroom with his girlfriend and turned up the radio, so Wilder and Braddock left. T III 140-142.

Sam Braddock went on to state that he and Wilder were in the car with the engine and radio on. Mr. Braddock saw Clyde Jordan with a gun. Braddock ducked and Jordan started shooting. Braddock fired back. He saw Jordan running away, but fired two more shots at Jordan. T III 143-144, 154-157. Mr. Braddock was wounded and was sitting on the ground next to the car and to Wilder when Adrenna Glenn approached. He pointed his pistol at her and told her to get away and to call an ambulance. T III 163-165. Shortly thereafter a green car drove down the street. When it slowed down and the door began to open, Sam Braddock saw Clyde Jordan point his pistol out the passenger door, so Braddock fired a shot at him; the car left. T III 165-168; T IV 3-6. Mr. Braddock got into Tyrone Wilder's car, drove it to a gas station, left his pistol in the car, and gave a cab driver $100 to drive him to the hospital. T III 160; T IV 7-8.

> Tinsley Walls testified for the defense that he went to the apartment of Adrenna Glenn and Clyde Jordan on the evening of April 8. He fell asleep and awoke when he heard a gun fired. T IV 76-77. He heard more shots and ran out the back door of the building. As he was crossing the street he ran into the door of a car turning the corner. T IV 78-81. He looked back and saw the car passenger, someone he knew as "Little Man," stick a nine millimeter pistol out the window and shoot Tae-Tae Wilder three times in the back. Mr. Wilder was lying on the ground and Sam Braddock was crawling away. T IV 82-86.
>
> Reginald Furlow, a man who lived down the block on Goulburn from Clyde Jordan's building, also testified for the defense. Mr. Furlow heard gunshots and then a few minutes later heard his front window break. T IV 121-122. Mr. Furlow opened his inside door and through the screen door saw Clyde Jordan lying on the porch. Mr. Jordan was bleeding profusely and told Furlow that he had been shot and to call 911. T IV 123-124. After Jordan was already lying on the porch, Furlow heard many more gunshots before the police finally arrived. T IV 124-125, 129-130.
>
> Defendant Clyde Jordan testified he and Tyrone Wilder were going to buy drugs together and that Jordan had a large amount of money on him. T IV 137-139. While they were in the car, Wilder and Braddock said something about being followed. Sam Braddock pulled out his pistol and cocked it. T IV 142. Clyde Jordan decided that he wanted to go home. He was scared of being shot by Braddock. T IV 147; TV 42-43. When Jordan got into his apartment, he grabbed his rifle. Braddock and Wilder used the bathroom and then returned to the car. They honked the horn and Wilder yelled to Jordan to come back out. T IV 149-150; TV 19-20. Defendant Jordan went down to the back door of the building, carrying the rifle because he was scared. He was standing in the doorway when Sam Braddock leaned out the car window and started shooting. T IV 151-153; TV 12,28-29. Mr. Jordan was hit twice, once in the abdomen and once in the arm, and surgery was necessary to take out the bullets. T IV 153-157.
>
> Clyde Jordan went on to state that he fired back and then ran away. T IV 157-159. He went to a house down the block, where he told the owner that he was shot. T IV 160. Mr. Jordan was on the porch when he heard more shots. T IV 161.

Pet. Suppl. App. Br., pp. 2-7.

Following his convictions and sentencing, Petitioner, through counsel, filed an appeal of right with the Michigan Court of Appeals raising claims concerning the jury

5

instructions, the conduct of the prosecutor, and the admission of his girlfriend's testimony. The court denied relief on those claims and affirmed his convictions. *People v. Jordan*, No. 172267, 1997 WL 33350698 (Mich. Ct. App. April 29, 1997). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Jordan*, 575 N.W.2d 558 (Feb. 27, 1998).

On February 16, 2005, Petitioner filed a motion for relief from judgment in the state trial court raising claims concerning the sufficiency of the evidence for the first-degree murder and assault convictions, the bindover decision, the effectiveness of trial counsel (for not objecting to jury instructions and for the prosecutor's closing arguments) and appellate counsel, and cumulative error. The trial court denied the motion, finding that the claims lacked merit such that Petitioner had failed to establish actual prejudice under Michigan Court Rule 6.508(D)(3). *People v. Jordan*, No. 93-005473 (Wayne Co. Cir. Ct. Jan. 8, 2008). Petitioner filed a motion for reconsideration asserting that he had newly-discovered evidence, including statements by three witnesses who observed him on Reginald Furlow's porch and a witness who observed the fatal shooting. The trial court gave Petitioner thirty days to provide witness statements in support of his claims. In response, Petitioner submitted an affidavit from fellow inmate Marshall Burns, a letter from his girlfriend Adrenna Glenn, and excerpts from his jury trial transcripts. The trial court found that Burns's affidavit was cumulative and not reliable, that Glenn's letter was not newly-discovered, and that Petitioner's remaining claims had already been considered; thus the court denied reconsideration on March 28, 2008. Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals asserting that the trial court abused its discretion in denying

relief from judgment and in rejecting his newly-discovered evidence and that the prosecutor failed to disclose a police report that could provide exculpatory evidence. The court denied leave to appeal for failure to "meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Jordan*, No. 289329 (Mich. Ct. App. May 20, 2009) (unpublished). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Jordan*, 779 N.W.2d 508 (March 29, 2010).

On July 22, 2010, Petitioner filed a second motion for relief from judgment and request for evidentiary hearing with the state trial court claiming newly-discovered evidence—that a police report concerning three witness interviews was withheld from him. The trial court ruled that his claims were not based upon newly-discovered evidence as they involved information previously presented to the state courts on direct appeal or collateral review and denied the motion pursuant to Michigan Court Rule 6.502(G), as well as Michigan Court Rule 6.508(D). *People v. Jordan*, No. 93-005473 (Wayne Co. Cir. Ct. Nov. 29, 2010). The trial court denied reconsideration on January 5, 2011. Petitioner did not pursue an appeal in the state courts.

Petitioner submitted a federal habeas petition dated September 23, 2011, and filed an amended petition on February 29, 2012. In his initial petition, he raises claims concerning the state courts' denial of relief on his newly-discovered evidence claim (claim I), the prosecutor's alleged failure to disclose potentially exculpatory information (claim II), the suppression of three potential witnesses interviewed by the police (claim III), the alleged intimidation of witness Adrenna Glenn (claim IV), the effectiveness of trial counsel (claim V), and cumulative error (claim VI). In his amended petition, he

7

raises claims concerning the alleged suppression of a police report and the names of three potential witnesses (claims I and II), the Michigan appellate court's rulings on those issues (claims III and IV), an evidentiary hearing on the suppression claim (claim V), discovery (claim VI), appointment of counsel (claim VII), the state trial court's ruling on new evidence of a fellow prisoner's affidavit (claim VIII), statutory tolling of the one-year limitation period (claim IX), equitable tolling of the one-year period (claim X), an evidentiary hearing on his actual innocence claim (claim XI), and the exhaustion of the suppression issue in his first motion for relief from judgment (claim XII).

Respondent has filed an answer to the petition and moved for summary judgment, asserting that the petition should be dismissed for failure to comply with the one-year limitation applicable to federal habeas actions and that Petitioner's claims are not cognizable, barred by procedural default, and lack merit. In reply, Petitioner has filed a motion to strike Respondent's motion and a cross-motion for summary judgment claiming that the one-year period should be tolled and that he is actually innocent.

## II. DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, governs the filing date for this action because Petitioner filed his petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA includes a one-year limitation for habeas petitions brought by prisoners challenging state court judgments. The statute provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> > (A) the date on which the judgment became final by the conclusion

>  of direct review or the expiration of the time for seeking such review;
>
>  (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
>  (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
>  (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
>  (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d). A habeas petition filed outside the time prescribed by this section must be dismissed. *See Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir. 2000) (dismissing case filed 13 days after the limitation period expired); *Wilson v. Birkett*, 192 F.Supp.2d 763, 765 (E.D. Mich. 2002).

Petitioner's convictions became final after the AEDPA's April 24, 1996, effective date. The Michigan Supreme Court denied leave to appeal on direct appeal on February 27, 1998. His convictions became final ninety days later, *see Jimenez v. Quarterman*, 555 U.S. 113, 120 (2009) (a conviction becomes final when "the time for filing a certiorari petition expires"); *Lawrence v. Florida*, 549 U.S. 327, 333 (2007); S. Ct. R. 13(1); on May 28, 1998. Accordingly, Petitioner was required to file his habeas petition by May 28, 1999, excluding any time during which a properly filed application for state post-conviction or collateral review was pending in accordance with 28 U.S.C. §

2244(d)(2).

Petitioner did not file his first motion for relief from judgment with the state trial court until 2005. Thus, the one-year period expired well before he sought state post-conviction or collateral review. A state court post-conviction motion that is filed following the expiration of the limitation period cannot toll that period because there is no time remaining to be tolled. *Hargrove v. Brigano*, 300 F.3d 717, 718 n. 1 (6th Cir. 2002); *Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000); *see also Jurado v. Burt*, 337 F.3d 638, 641 (6th Cir. 2003). The AEDPA limitations period is only tolled while a prisoner has a properly filed motion for post-conviction or collateral review under consideration. *See* 28 U.S.C. § 2244(d)(2); *Hudson v. Jones*, 35 F.Supp.2d 986, 988 (E.D. Mich. 1999). The AEDPA limitation period does not begin to run anew after the completion of state post-conviction proceedings. *Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001). The petition is untimely.

Petitioner does not allege that the State created an impediment to the filing of his habeas petition or that his claims are based upon newly-enacted, retroactively applicable law. Rather, he asserts that he has newly-discovered evidence—an affidavit from fellow prisoner Marshall Burns who claims that he saw another man commit the fatal shooting and an undisclosed police report by Detroit Police Officer Edward Burley reflecting interviews with Reginald Furlow and three other people at his residence.

As an initial matter, Petitioner's claims concerning the alleged intimidation of witness Adrenna Glenn and the effectiveness of trial counsel are not based upon the Burns's affidavit or the police report. Those claims were thus available to Petitioner at the time of his trial and his direct appeal and well before the expiration in 1999 of the

one-year limitation period. Thus, the one-year limitation period as to those claims expired in 1999, well before Petitioner filed the instant petition. *See Ege v. Yukins*, 485 F.3d 364, 373-74 (6th Cir. 2007) (Section 2244(d)(1)(D) delayed start of due process claim based upon new evidence but did not delay start of the limitation period for ineffective assistance of counsel claim that was not based upon new factual predicate); *DiCenzi v. Rose*, 452 F.3d 465, 469-70 (6th Cir. 2006) (holding that limitation period on delayed appeal claim began on different date than sentencing claims); *see also Pace v. DiGuglielmo*, 544 U.S. 408, 416, n. 6 (2005) (noting that § 2244(d)(1)(A) provides for calculating the limitation period for the "application" as a whole and that §§ 2244(d)(1)(B), (C), (D), require claim-by-claim review). Furthermore, as discussed *infra*, Petitioner fails to demonstrate that he is entitled to equitable tolling of the one-year period. His witness intimidation and ineffective assistance of counsel claims are thus untimely and barred by the limitation.

As to the remaining claims, even assuming that Petitioner has newly-discovered evidence which would serve to re-start the one-year period, his petition is still untimely. Petitioner waited more than one year after the conclusion of state court collateral review (his first motion for relief-from-judgment proceedings) to institute this action. The Michigan Supreme Court denied leave to appeal on collateral review on March 29, 2010. Petitioner did not submit his initial federal habeas petition until September 23, 2011, more than seventeen months later.

Petitioner filed a second motion for relief from judgment with the state trial court in July, 2010. That second motion, however, did not further toll the one-year period. An application for state post-conviction relief must be "properly filed" in order to trigger the

11

tolling provisions of 28 U.S.C. § 2244(d)(2). Under Michigan Court Rule 6.502(G), a criminal defendant in Michigan can typically only file one motion for relief from judgment concerning a conviction. The rule allows for the filing of a second or subsequent motion only based upon a retroactive change in the law that occurred after the first motion was filed or a claim of new evidence that was not discovered before the first motion. *See* Mich. Ct. R. 6.502(G). In this case, Petitioner's second motion for relief from judgment was denied by the trial court pursuant to Michigan Court Rule 6.502(G) on the ground that it was a successive motion for relief from judgment and Petitioner had not shown that he had newly-discovered evidence so as to fall within one of the exceptions to the rule.[1] Because Petitioner's second motion for relief from judgment was denied by the trial court pursuant to Michigan Court Rule 6.502(G), it was not properly filed and did not serve to toll the one-year limitations period under 28 U.S.C. § 2244(d)(2). *See Williams v. Birkett*, 670 F.3d 729, 733-36 (6th Cir. 2012) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005) and ruling that a Michigan prisoner's second motion for relief from judgment which was denied pursuant to Michigan Court Rule 6.502(G) was not "properly filed" and did not toll the one-year limitation period); *Gino v. Metrish*, 393 F. App'x 299, 300 n. 1 (6th Cir. 2010); *Rodriguez v. McQuidgen*, No. 08-CV-13263, 2009

---

[1] The state trial court also cited Michigan Court Rule 6.508(D)(2) and (3) in denying relief. The citation to Michigan Court Rule 6.508(D)(2) reflected the fact that some of the claims raised by Petitioner in his second motion for relief from judgment had been decided against him in prior proceedings. The citation to Michigan Court Rule 6.508(D)(3) was an alternative basis for dismissal and does not affect the court's reliance on Michigan Court Rule 6.502(G). Petitioner also did not appeal the trial court's decision, in keeping with the provision that such appeals are barred under state law. *See* Mich. Ct. R. 6.502(G)(1). Moreover, Petitioner admits that he exhausted his claims in his first motion for relief from judgment and asks the court to disregard his second motion. *See* Pet. Brf., pp. 72-73.

WL 2742004, *8 (E.D. Mich. Aug. 25, 2009). His petition is therefore untimely under 28 U.S.C. § 2244(d).

The one-year limitation is not a jurisdictional bar and is subject to equitable tolling. *Holland v. Florida*, ___ U.S. ___, 130 S.Ct. 2549, 2560 (2010). A habeas petitioner is entitled to equitable tolling, however, "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Robertson v. Simpson*, 624 F.3d 781, 783-84 (6th Cir. 2010). A petitioner has the burden of demonstrating that he is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). "Typically, equitable tolling applied only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Jurado*, 337 F.3d at 642 (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)).

Petitioner makes no such showing. The fact that he is untrained in the law, is (or was) proceeding without a lawyer, or may for a time have been unaware of the limitation does not warrant tolling. *See Allen*, 366 F.3d at 403 (ignorance of the law does not justify tolling); *Rodriguez v. Elo*, 195 F.Supp.2d 934, 936 (E.D. Mich. 2002) (the law is "replete with instances which firmly establish that ignorance of the law, despite a litigant's pro se status, is no excuse" for failure to follow legal requirements); *Holloway v. Jones*, 166 F.Supp.2d 1185, 1189 (E.D. Mich. 2001) (lack of professional legal assistance does not justify tolling); *Sperling v. White*, 30 F.Supp.2d 1246, 1254 (C.D. Cal. 1998) (citing cases stating that ignorance of the law, illiteracy, and lack of legal

13

assistance do not justify tolling). Petitioner's contention that his habeas claims have merit also does not justify tolling the limitations period. *Holloway*, 166 F.Supp.2d at 1191. Petitioner has not shown that he is entitled to equitable tolling under *Holland*.

A credible claim of actual innocence may equitably toll the one-year limitation period. *Souter v. Jones*, 395 F.3d 577, 588-90 (6th Cir. 2005); *see also Holloway,* 166 F.Supp.2d at 1190. As explained in *Souter*, to support a claim of actual innocence, a petitioner in a collateral proceeding "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)); *see also House v. Bell*, 547 U.S. 518, 537-39 (2006). A valid claim of actual innocence requires a petitioner "to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness account, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Furthermore, actual innocence means "factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623. The actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 321).

Petitioner asserts that he has newly-discovered evidence of his actual innocence, relying upon an affidavit from fellow inmate Marshall Burns and a police report by Detroit Police Officer Burley. Neither document, however, establishes his factual innocence. The Burns affidavit, in which Burns claims that he saw Jerome Sutton kill Tyrone Wilder, is highly questionable. First, Burns is a convicted felon who is currently incarcerated. Such statements are viewed with suspicion. *See Milton v. Secretary,*

14

*Dep't of Corr.*, 347 F. App'x 528, 531–32 (11th Cir. 2009) (affidavits from fellow inmates and family members created after trial are not sufficiently reliable evidence to support a claim of actual innocence); *Mendez v. Graham*, No. 11-CV-5492, 2012 WL 6594456, *11-12 (E.D.N.Y. Dec. 18, 2012) (finding that fellow inmate's affidavit, executed after meeting habeas petitioner in prison, and containing confession to petitioner's crime, was unreliable); *Torres v. Graham*, No. 06-CV-508, 2009 WL 4730313, *4 n. 8 (W.D.N.Y. Dec. 5, 2009) (finding that affidavits from fellow inmates who were supposedly present at the shooting and alleged that petitioner was not the shooter were unreliable); *see also Herrera*, 506 U.S. at 423 ("It seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him").

Second, Burns signed his affidavit only after being incarcerated with Petitioner—and did so fifteen years after the crime. New statements from witnesses years after the crime are inherently suspect, *see Schlup*, 513 U.S. at 331, and are viewed with "a fair degree of skepticism." *Herrera*, 506 U.S. at 423 (O'Connor, J., concurring); *see also McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) (citing *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001). This is particularly so here where Burns only came forward after meeting Petitioner in prison and there is no independent evidence indicating that he was present at the scene of the crime.

Third, Burns's proposed testimony conflicts with victim Samuel Braddock's testimony that Petitioner shot him and killed Tyrone Wilder. Adrenna Glenn also testified about Petitioner's intent to shoot someone, his departure from her home, hearing shots shortly thereafter, and seeing Wilder and Braddock outside just after they had been shot. Petitioner also admitted shooting at both men, albeit claiming self-

defense. Additionally, while Burns's testimony would be consistent with Tinsley Wall's testimony that Jerome Sutton killed Tyrone Wilder, it would also be cumulative to that testimony. Thus, Burns's affidavit merely reinforces an existing conflict in the trial testimony and does not establish Petitioner's actual innocence. *See, e.g., Moore-El v. Luebbers*, 446 F.3d 890, 902–03 (8th Cir. 2006) (testimony of possible eyewitness only "would have established conflicting testimony among purported eyewitnesses to the murder, a circumstance that already existed," and therefore was insufficient to satisfy actual innocence standard). Given the foregoing circumstances, it cannot be said that the Burns affidavit would make it more likely than not that no reasonable juror would find Petitioner guilty beyond a reasonable doubt.

Officer Burley's police report also does not establish Petitioner's actual innocence. Petitioner claims that it could have been used to confirm Reginald Furnow's trial testimony that he heard additional gunshots after finding Petitioner injured on his porch. At trial, the prosecutor impeached Furnow with his police statement, which did not reflect that fact, but the police report indicates that Furnow reported hearing a second set of shots. Such newly-discovered rehabilitation evidence, however, does not provide sufficient evidence of actual innocence to overcome a procedural bar. *See Calderon v. Thompson*, 523 U.S. 538, 563 (1998) (newly-discovered impeachment evidence, which is "a step removed from evidence pertaining to the crime itself," "provides no basis for finding" actual innocence); *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) (new impeachment evidence "will seldom, if ever," establish actual innocence).

Petitioner also claims the police report could lead to exculpatory evidence because it references three potential witnesses—people who were present at Reginald

16

Furlow's residence at the time of the crime. Petitioner's claim is purely speculative. He provides no statements or affidavits from the people he believes could offer exculpatory evidence. Conclusory allegations, without evidentiary support, do not provide a basis for habeas relief or necessitate an evidentiary hearing. *Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007); *Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient basis for an evidentiary hearing in habeas proceedings). Moreover, even if the three witnesses would testify that they heard additional gunshots after Petitioner was lying on the porch, such testimony would be cumulative to Reginald Furnow's (and Petitioner's testimony). More importantly, it would not exonerate Petitioner from committing the fatal shooting, particularly given Samuel Braddock's trial testimony and Petitioner's own admissions about shooting at the victims. Petitioner has failed to show that Officer Burley's report would make it more likely than not that no reasonable juror would convict him.

Lastly, Petitioner's own self-serving, conclusory assertions of innocence are insufficient to support his actual innocence claim. "A reasonable juror surely could discount [a petitioner's] own testimony in support of his own cause." *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (citing cases). Moreover, his trial testimony that he shot at the victims in self-defense belies his claim that he is actually innocent. In sum, the court cannot say that in light of the new evidence presented by Petitioner, no reasonable juror would have voted to find him guilty beyond a reasonable

17

doubt. *Schlup*, 513 U.S. at 329. Petitioner has failed to demonstrate that he is entitled to equitable tolling of the one-year limitation period. His petition is therefore untimely and must be dismissed.

### III. CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). When a court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id*.

Having undertaken the requisite review, the court concludes that jurists of reason could not find the court's procedural ruling that the petition is untimely debatable.

### IV. CONCLUSION

Based on the foregoing, the court concludes that the petition is untimely. Accordingly, Respondent's motion for summary judgment [Dkt. # 10] is GRANTED and the petition for a writ of habeas corpus is DISMISSED WITH PREJUDICE. Given this determination, Petitioner's motion to strike [Dkt. # 13] and cross-motion for summary judgment [Dkt. # 12] are DENIED. Any request for discovery, an evidentiary hearing, or

an appointment of counsel is DENIED also.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED. The court also DENIES Petitioner leave to proceed *in forma pauperis* on appeal, as an appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

      s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: February 28, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, February 28, 2013, by electronic and/or ordinary mail.

      s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522